| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** |
| **FAEGRE DRINKER BIDDLE & REATH LLP**<br>A Delaware Limited Liability Partnership<br>600 Campus Drive<br>Florham Park, New Jersey 07932-1047<br>(973) 549-7000 (Telephone)<br>(973) 360-9831 (Facsimile)<br>Michael P. Pompeo<br>Marita S. Erbeck<br>*Proposed Counsel to the Debtors and Debtors in*<br>*Possession* |

| | |
|---|---|
| In re: | Chapter 11 |
| ALLIANT TECHNOLOGIES, LLC (d/b/a TenFour), *et al.*,[1] | Case No. 21-19748 (JKS) |
|         Debtors. | Joint Administration Requested |

## DECLARATION OF MARK P. CANTALUPPI IN SUPPORT
## OF DEBTORS' FIRST-DAY MOTIONS

I, Mark P. Cantaluppi, hereby declare under penalty of perjury:

      1.      I am the Chief Executive Officer of Technology Keiretsu, LLC, one of the above-

captioned debtors and debtors in possession (collectively, the "Debtors"), which is the parent

Debtor of each of the other Debtors and various non-debtor subsidiaries. I was initially hired as

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification are as follows: Alliant Technologies, L.L.C. (d/b/a TenFour) (7583), Technology Keiretsu, LLC (8793), AlliantWare, L.L.C. (7589), and Red Forge LLC (8662). The mailing address for the Debtors is 360 Mt. Kemble Avenue, Morristown, New Jersey 07960 (Attn: Mark P. Cantaluppi).

the Debtors' Chief Financial Officer in February 2020 and named the Debtors' CEO in December 2020. As CEO, I am responsible for assisting in the management of the Debtors and their affiliates' operations, overseeing their liquidity management, and assisting with their restructuring process. In the course of serving in my various capacities with the Debtors, I have become familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (these "Chapter 11 Cases") by filing voluntary petitions for relief (the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), with this United States Bankruptcy Court for the District of New Jersey ("Court").  The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.  Concurrently herewith, the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      I submit this Declaration pursuant to Bankruptcy Rule 1007 to provide an overview of the Debtors' business and these Chapter 11 Cases and to support the Debtors' applications and motions for "first-day" relief (collectively, the "First-Day Motions").  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management, consultation with the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I believe all information

2

herein to be true to the best of my knowledge.  I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.    To familiarize the Court with the Debtors, the Chapter 11 Cases, and the relief sought in the First Day Motions, this Declaration provides a summary overview of the Debtors and the Chapter 11 Cases, and is organized as follows.  Part I describes the Debtors' business operations, corporate structure, key liabilities, and estate assets.  Part II describes the events leading up to the commencement of the Chapter 11 Cases.  Part III summarizes the Debtors' goals in commencing these Chapter 11 Cases.  Part IV sets forth my basis for testifying to the facts underlying and described in the First-Day Motions.

5.    As set forth in greater detail below, and as reflected in the First-Day Motions, the Debtors have filed these Chapter 11 Cases to preserve and maximize the value of their assets for the benefit of their creditors and other stakeholders. The Debtors have executed a Stalking Horse Agreement (defined below) with a lead bidder, subject to higher or otherwise better bids in a competitive, market-tested sale and auction process to be approved by this Court.

## I. BACKGROUND REGARDING THE DEBTORS

### A.    Overview of the TenFour Business

6.    Alliant Technologies, LLC (d/b/a TenFour) ("TenFour") is a premier provider of comprehensive, turnkey, subscription-based networking and communications services for companies around the world. TenFour handles the hardware, software, connectivity, and services from design to deployment to monitoring and problem mitigation, integrating all of the parts into a seamless, single-source whole. Founded in 1998 as Alliant Technologies and headquartered in

Morristown, N.J., TenFour has a legacy of solving challenging problems in complex IT environments.

7.      TenFour's competitive advantage is built upon its positioning at the forefront of the Network-as-a-Service ("NaaS") trend, an emerging model for organizations to consume network infrastructure through flexible operating expense subscriptions that bundle hardware, software, circuits, management tools, licenses and service into a single package. TenFour's comprehensive service offerings include all of the networking and communications technology needed to securely and reliably manage employees and resources paired with 24x7x365 support from TenFour's Network Operations Center strategically located at the Debtors' headquarters. TenFour's NaaS capabilities are built upon its proprietary reference architecture and system designs, allowing TenFour to efficiently customize and scale its services to meet each customer's unique needs.

8.      TenFour has a long-standing and loyal customer base comprised of a mix of new customers acquired in the last five years and long-term customers with relationships dating back to 2004 that have converted to TenFour's NaaS model. The Debtors' revenue pipeline includes national retailers and manufacturers representing key customer demographics with increasing recognition of the compelling advantages of NaaS solutions—proven to be efficiently adapted across distributed environments while offering maximum flexibility with no up-front costs as new locations come online. TenFour has longstanding relationships with key industry players Cisco and AT&T and has identified additional partnership opportunities for expanding the Debtors' marketing and service delivery capabilities specifically for the mid-market.

ACTIVE.134569051.15

### B. Corporate and Capital Structure

9.      Debtor Technology Keiretsu, LLC ("Technology Keiretsu") is the ultimate parent of all of the Debtors. Technology Keiretsu owns 99.99% of the equity interests in TenFour and Red Forge LLC.[2] TenFour, in turn, owns 99.99% of the equity interests in Alliant Ware L.L.C.[3] The equity in Technology Keiretsu is comprised of multiple classes of Common Interests, Preferred Interests, and Management Incentive interests.

10.     TenFour is the Debtors' main operating entity. Alliant Ware is counterparty to certain vendor contract that provide services to TenFour.  Red Forge owns the intellectual property used in TenFour's business.

### C. Principal Liabilities and Assets

11.     The Debtors' most recent set of unaudited financial statements reflect assets with a book value totaling approximately $21,733,000 and liabilities totaling approximately $21,586,000 as of September 30, 2021.

12.     Pursuant to an agreement dated May 9, 2016, Valley National Bank ("Valley Bank") agreed to provide a commercial line of credit loan ("LOC") to TenFour. TenFour's obligations under the LOC ("Valley Bank Indebtedness") are secured by liens in all of TenFour's personal property.  The Valley Bank Indebtedness is guaranteed by Debtors Technology Keiretsu, LLC, Alliant Ware L.L.C, and non-debtors Alliant-Cay, LLC and ICS Cabling, LLC (the "Guarantors").  The maturity date of the LOC occurred on November 1, 2021. On November 5, 2021, Valley Bank, TenFour and the Guarantors entered into that certain Forbearance Agreement

---

[2] The remaining 0.01% of each of these entities' equity interests are held by an individual member of Technology Keiretsu, LLC for federal tax purposes.

[3] The remaining 0.01% of this entity's equity interests are held by Technology Keiretsu, LLC for federal tax purposes.

ACTIVE.134569051.15

which provided, among other things, for payment of $50,000 of the Valley Bank Indebtedness. As of the Petition Date, the outstanding principal amount under the LOC is approximately $2,414,772.97; together with applicable interest and late charges, the total balance outstanding is $2,443,157.14.

13.    On December 9, 2021, Valley Bank, TenFour and the Guarantors entered into a second forbearance agreement, pursuant to which TenFour paid to Valley Bank an additional $50,000 to pay down the Valley Bank Indebtedness in exchange for the Valley Bank's agreement to forbear from exercising its rights and remedies through and until December 17, 2021.

14.    Pursuant to that certain Convertible Note Purchase Agreement dated September 30, 2020, by and between Technology Keiretsu and NSG IV Unblocked AIV, L.P., NSG IV Subsidiary AIV, L.P., and the other investors listed therein (collectively, the "Rescue Investors"), Technology Keiretsu agreed to issue unsecured subordinated convertible promissory notes in a maximum principal amount of $6,000,000 with a maturity date of January 31, 2022 ("Subordinated Rescue Investor Notes"). The Subordinated Notes are subordinated to the Valley Bank Indebtedness. As of the Petition Date, all of the Subordinated Notes had been issued and the outstanding principal amount under the Subordinated Notes is $6,000,000.

15.    Technology Keiretsu issued a series of convertible subordinated notes to specific members of management starting in December 2020 (collectively, the "Subordinated Executive Compensation Notes") in a total maximum principal amount of approximately $315,000. Specifically, in lieu of cash bonuses due to be received on March 31, 2021 in the total amount of approximately $192,000, Douglas H. Place, Michael W. Funk, and I (collectively, the "Deferred Executives") each received and hold a Subordinated Convertible Promissory Note dated March 31, 2021. In lieu of a $50,000 cash retention bonus due to be received on June 2, 2021, I received

6

and hold a Subordinated Convertible Promissory Note dated June 2, 2021. In lieu of cash salary due to be received during 2021, each of the Deferred Executives holds a Subordinated Convertible Promissory Note. The total maximum[4] principal amount of the deferred salary notes is $75,000. As of the Petition Date, the total principal amount outstanding under the deferred salary notes is $73,000. The indebtedness under the Subordinated Executive Compensation Notes is subordinated to the Valley Bank Indebtedness. Interest accrues but remains unpaid at a rate of 12% per annum until the maturity date. The maturity date for all of the Subordinated Executive Compensation Notes is January 31, 2022.

16.    Pursuant to related agreements with equipment lessors and/or financiers, TenFour leases certain of the equipment used in its business. The counterparties purportedly hold security interests in certain of the equipment and related assets, including certain accounts receivable. According to the Debtors' latest set of unaudited financial reports, the book value of TenFour's total capital lease obligations were approximately $6,902,000 as of September 30, 2021. The remainder of the Debtors' liabilities consist primarily of accounts payable and accrued expenses to suppliers and other vendors in a total book value amount of approximately $3,316,000 as of September 30, 2021.

## II. EVENTS LEADING TO CHAPTER 11 FILING

17.    Despite its fundamentally strong business, TenFour is one of the many companies severely affected by the COVID-19 pandemic and its impact on global supply chains.  As calendar 2019 was coming to a close, expectations were high for the Debtors.  During November 2019,

---

[4] Each of the Deferred Executives agreed to receive principal under their respective deferred salary note in lieu of cash for a portion of their salary due each pay period for the remainder of 2021. As a result, the principal under the notes increases over time.

$2.1 million of capital was raised from a private investor group. Separately, the Debtors sought to implement a new go-to-market strategy and to repay outstanding balances on their trade payables and the LOC. In furtherance of these goals, management was actively discussing joint business opportunities and potential capital raise transactions with a large strategic organization.

18.    By mid-March 2020, the United States was becoming overwhelmed by the Coronavirus with work stoppages, quarantines and work from home mandates. As the pandemic raged across the country and world, the Debtors reviewed their customer base and determined that they would make every effort to continue providing necessary IT infrastructure services to all customers, but especially to customers in essential industries that would need to continue to operate during the pandemic. Those essential industries included dairy processors, grocery chains and other businesses that support those industries. The Debtors were committed to maintain their IT infrastructure operations and staffing levels.

19.    In April 2020, the Debtors applied for and received a $1,821,916 loan from the Paycheck Protection Program (PPP) established by Section 1102 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). The loan was forgiven in May 2021 pursuant to the CARES Act PPP.

20.    As the economy ground to a halt during the second quarter of 2020, customer payments slowed, the Debtors' operating revenue suffered, and outstanding payables grew. In response, the Debtors' management team initiated an aggressive cost control campaign. In July 2020, management salaries were reduced by 20% and many rank and file employees were moved to a four day work week at reduced compensation.

21.    During the third quarter of 2020, the Debtors began negotiations with vendors to structure payment terms on outstanding balances. Effective September 1, 2020, the Debtors'

8

management team implemented a second compensation reduction plan that furloughed 12 employees, temporarily reduced leadership's compensation by a total of 40% and reducing most other employees by 20% in an effort to reduce the cash burn.

22.     On September 30, 2020, the Debtors, in consultation with Valley Bank, came to terms with the Rescue Investors to provide three (3) tranches at $2 million each of subordinated rescue capital to help bridge the gap with vendors, and allow the Debtors to have working capital to invest in revenue growth.  The results of these efforts were the funds provided under the Subordinated Rescue Investor Notes.  The first funding occurred on September 30, 2020.  The second tranche was funded in December 2020. The final $2 million was funded in May 2021. As a result of the capital infusion, the Debtors were able to pay their vendors, landlord, and pay down $350,000 of the Valley Bank Indebtedness.

23.     At the same time, the Debtors' senior management collectively agreed to defer cash compensation of $345,000 that was owed to them in March 2021, and up to an additional $106,000 owed through the remainder of 2021. Instead of having those amounts of their salaries and bonuses in cash, the Debtors' senior management now hold the Subordinated Executive Compensation Notes.  By August 1, 2021, all employees were brought back to full compensation levels and only five (5) employees remained on furlough.

24.     On February 6, 2021, the Debtors obtained a second PPP loan of approximately $1,822,000 on substantially the same terms as the first. In October 2021, the second loan was also forgiven pursuant to the CARES Act PPP.

25.     Pursuant to the CARES Act, the Debtors availed themselves of the Employee Retention Credit ("ERC").  Under this program, the Debtors were able to reduce their payments to

the Internal Revenue Service for employment related taxes by $422,000 in the second quarter of

2021, and by $482,000 in the third quarter of 2021.[5]

26.      While many sectors of the economy have recovered from the pandemic, the IT

industry continues to suffer major supply chain shortages.  Technology dependent equipment like

switches, routers and wireless devices used in the TenFour's business all require semiconductors,

or chips; and there is a major worldwide shortage in chips.  As an example for TenFour, a

significant new customer contract was entered in July 2021. Normally, the equipment necessary

to implement the new system would arrive in less than thirty days, typically closer to twenty days.

Given the current supply delays, TenFour does not expect that its revenue streams will return to

normal until at least the second quarter of 2022.  Management also believes that the supply chain

interruptions are causing delays in buying decisions, resulting in fewer closing opportunities in the

fourth quarter of 2021.

### III. THE PURPOSE OF THESE CHAPTER 11 CASES

27.      The Debtors have initiated these chapter 11 cases to effectuate a sale pursuant to

section 363 of the Bankruptcy Code of substantially all of their assets. For several months, the

Debtors and their professionals have engaged in a robust and ultimately fruitful marketing and sale

process. The Debtors now stand on the threshold of consummating a going concern sale transaction

designed to maximize recoveries for creditors, continue uninterrupted service to the Debtors'

customers, and preserve employment for TenFour's workforce.

---

[5] On June 22, 2021, the Debtors claimed an additional ERC in the amount of $520,000 for the first quarter of 2021 that should have been processed as a refund.  Due to delays at the Internal Revenue Service in processing refund requests, the Debtors have not yet received the anticipated refund.  Certain provisions of the Infrastructure Investment and Jobs Act signed into law on November 15, 2021 have eliminated the ERC.

ACTIVE.134569051.15

28.    In April 2021, the Debtors engaged Phoenix Capital Management, a financial advisory firm to evaluate the Debtors' projections, cash flows, cost reduction initiatives and other operating alternatives.  The Debtors engaged Stout Capital LLC in June 2021 to provide financial and investment banking services.  The Stout team explored strategic alternatives, including a financing or sale of the Debtors to an investor or strategic acquirer.

29.    The Debtors prepared financial projections and a Confidential Management Presentation ("CMP").  In August 2021, Stout commenced its initial outreach which included teasers being distributed to 159 potential purchasers (76 strategic, 44 hybrid and 39 financial buyers).  A total of 35 NDAs were executed and 35 CMPs were distributed.  Indications of Interest ("IoIs") were received from 3 parties during September and October 2021.  The indications of interest suggested the Debtors' value was well below initial expectations.

30.    On October 29, 2021, the Debtors received a revised non-binding letter of intent from Acuative Corporation (or its designee, the "Stalking Horse Purchaser") for the purchase of substantially all of the operating assets and business of the Debtors, but excluding cash and accounts receivables. As consideration, the Stalking Horse Purchaser proposed to make an initial payment of $3,250,000 at closing, then additional earn-out payments at twelve and twenty-four months after closing, depending on whether certain revenue targets are met. Based on recent financial performance and current trends, it is possible that the final, all-in payment total from the Stalking Horse Purchaser could potentially be $6,000,000. In addition, the Stalking Horse Purchaser will assume certain of the Debtors' liabilities, including all of the Debtors' capital leases.

31.    The Stalking Horse Purchaser and the Debtors determined that an asset sale in a chapter 11 bankruptcy case was the most efficient implementation method. The parties negotiated the terms of an asset purchase agreement, completing that process just prior to the Petition Date

11

when, on December 20, 2021, the parties executed an asset purchase agreement (the "Stalking Horse Agreement"). In the Stalking Horse Agreement, the Stalking Horse Purchaser has committed to acquire substantially all of the Debtors' assets (but excluding cash and accounts receivables) in a sale (the "Sale") pursuant to section 363 of the Bankruptcy Code. The transaction is conditioned upon approval by this Court and is subject to higher or otherwise better competing offers, as will be described more fully in the Debtors' forthcoming motion to approve bidding procedures concerning, and sale of, substantially all of the Debtors' assets (the "Sale Motion").[6]

32.    The timeline and specific dates to be proposed in the Sale Motion and the associated bidding procedures, if approved, will provide TenFour sufficient time to re-market its business and assets to potential overbidders, conduct an auction if any qualified overbids are received, and present to the Court for approval of the sale to the winning bidder.

33.    The Debtors believe an expedited timeline to conduct the auction is warranted under the circumstances. Stout has extensively marketed the assets on a pre-petition basis for over 3 months, and does not believe there are a wide range of potential overbidders. The Debtors continue to burn cash and liquidity is limited, so there is significant concern that any material delay in conducting an auction and closing could impair the underlying business and negatively impact the outcome of the sale process.

## IV.    SUPPORT FOR RELIEF REQUESTED IN FIRST-DAY MOTIONS

34.    The Debtors have filed with their chapter 11 petitions a number of First-Day Motions seeking relief that the Debtors believe is critical and necessary to operate with minimal

---

[6] The Debtors expect to file the Sale Motion prior to the first-day hearing in these Chapter 11 Cases and, at that hearing, to request scheduling of a hearing to consider approval of the proposed bidding procedures. The Debtors do not intend to seek any other "first-day" relief with respect to the Sale Motion.

ACTIVE.134569051.15

disruption and to preserve the value of their assets and business during the Chapter 11 Cases. I have reviewed each of the First-Day Motions referenced below. The facts stated in each are true and correct to the best of my knowledge and belief, with appropriate reliance on the Debtors' employees and advisors. The relief sought in each First-Day Motion is necessary for TenFour to continue its operations with as little disruption as possible and to permit the Debtors to proceed with their efforts to maximize the value of their assets and the recovery for their creditors and stakeholders.

35.     The following is a summary of the relief requested in each First-Day Motion and the reasons for such requests. The facts set forth in the First-Day Motions are incorporated herein in their entirety.

### A.    Debtors' Application for Expedited Consideration of First Day Matters

36.     The Debtors request entry of an Order granting expedited consideration of their First Day Motions. I believe that the relief requested in this application is essential to avoid any disruption to the Debtors' operations as a result of the commencement of these Chapter 11 Cases and will preserve the value of the Debtors' assets. Accordingly, I respectfully submit that the Debtors' request for expedited consideration of the First Day Motions be approved.

### B.    Debtors' Motion Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases

37.     The Debtors request entry of an Order jointly administering these Chapter 11 Cases for procedural purposes only and request that the Court instruct the Clerk of Court to make an entry on each Debtor's docket reflecting the joint administration of these Chapter 11 Cases. Technology Keiretsu, LLC is the direct or indirect parent entity of the other Debtors. As such, each of the Debtors is "affiliated" with the others as defined by section 101(2) of the Bankruptcy Code.

13

38.     Joint administration of these cases will avoid the unnecessary time and expense of

drafting, filing, and serving duplicative motions, applications, orders, and other papers and related

notices in each case. Moreover, joint administration will relieve this Court of the burden of entering

duplicative orders and maintaining duplicative dockets and files and will ease the burden on the

U.S. Trustee in supervising these cases.

39.     I respectfully submit that joint administration will save considerable time, resources

and expense for all parties-in-interest and this Court and the relief requested should therefore be

granted.

**C.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of
Cash Collateral and Affording Adequate Protection; (II) Modifying
Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related
Relief (the "Cash Collateral Motion")**

40.     By way of the Cash Collateral Motion, the Debtors seek entry of an interim and

then final order authorizing them to use cash collateral of Valley Bank, the Debtors' prepetition

secured lender. In order to ensure they have sufficient funds to maintain the stability of their

business throughout the completion of the Sale process, the Debtors intend to use the Prepetition

Lender's Cash Collateral[7], with the consent of Valley Bank, in accordance with the terms of the

Budget that reflects the financial needs of the Debtors over the course of the Chapter 11 Cases. In

exchange for the use of their Cash Collateral, the Debtors intend to grant adequate protection and

other benefits to Valley Bank as set forth in more detail in the Cash Collateral Motion. The

proposed adequate protection and other benefits provide Valley Bank with a variety of safeguards

to protect against any diminution in the value of the Prepetition Lender's Cash Collateral.

---

[7] Any capitalized term used but not defined in this Part IV has the meaning contained in the applicable First-Day
Motion.

14

41.     The Debtors believe that the proposed adequate protection and other benefits for Valley Bank are necessary and appropriate to ensure that the Debtors can continue to use the Prepetition Lender's Cash Collateral to pay the Debtors' ordinary and necessary operating expenses as reflected in the Budget during these Chapter 11 Cases.  More specifically, the Debtors have an immediate need to use the Prepetition Lender's Cash Collateral to permit, among other things, the Debtor to sell its business pursuant to Section 363 of the Bankruptcy Code.  The access to sufficient working capital and liquidity through the use of Cash Collateral is vital to the preservation and maintenance of the Debtors' business operations while pursuing the sale.

42.     Based on the foregoing, I believe the relief requested in the Cash Collateral Motion is critical to the preservation of value while the Debtors pursue consummation of the Sale.

**D.     Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 for Entry of Interim and Final Orders (I) Approving Modified Cash Management System, (II) Authorizing the Debtors to Continue Using Existing Bank Accounts and Business Forms, and (III) Authorizing the Debtors to Continue Intercompany Transactions (the "Cash Management Motion")**

43.     In the Cash Management Motion, the Debtors request interim and ultimately final authority to (i) authorize the continued use of the Debtors' existing cash management system, bank accounts and business forms, and (ii) modifying the investment and deposit requirements.

44.     In the ordinary course of business, the Debtors use an integrated, centralized cash management system to collect, concentrate, and disburse funds generated by their operations (the "Cash Management System").  The Cash Management System is tailored to meet the Debtors' operational needs by enabling the Debtors to efficiently collect and disburse funds generated by their businesses, pay their financial obligations, including to its landlord, employees, lessees, and taxing authorities, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements and efficiently obtain accurate financial data.  It is

ACTIVE.134569051.15

critical that the Cash Management System remains intact to ensure a seamless continuation of operations and uninterrupted collection of revenues.

45.     Although some of the Cash Management System is automated, the Debtors' senior staff accountant (the "Senior Staff Accountant") manages the day-to-day collection of accounts receivable and the disbursement of the Debtors' funds.

46.     As of the Petition Date, the Debtors maintain a total of eleven (11) bank accounts, as detailed in the Cash Management Motion. Each of the Bank Accounts is insured by the Federal Deposit Insurance Corporation ("FDIC").

47.     As noted in the Cash Management Motion, the Bank Accounts at TD Bank include the Debtors' primary operating accounts.  These accounts are funded through payments by the Debtors' customers directly to the lockbox accounts TD Bank, by wire or ACH, which are then deposited into the TD Bank checking/operating accounts.

48.     The TenFour TD Bank lockbox account and the AlliantWare TD Bank lockbox account are accounts where TenFour and AlliantWare customers who pay by check have their funds deposited.  These funds are transferred to the TD checking accounts to fund operations. Occasionally, customers will mail payments directly to TenFour's headquarters.  These funds are also deposited in the TenFour TD checking account or the AlliantWare TD Bank checking account, as applicable.  Excess funds in the TD Bank checking accounts are transferred either to the TD Bank money market account or the Valley National Bank money market account where they earn a higher rate of return.

49.     The Fifth Third Bank lockbox account is used to receive payments from three customers that finance equipment through CIT.  These customers generally receive one invoice per month that includes charges for TenFour's services and as well as CIT's equipment costs.  Fifth

ACTIVE.134569051.15

Third wires funds attributable to amounts owed to CIT directly to CIT; the Debtors only receive the balance due and owing for TenFour's services. TenFour sweeps the Fifth Third Bank lockbox account approximately three times per month for deposit in the TD Bank checking/primary operating account.

50.    The Debtors' accounts payable are processed through the same central accounting system and are paid by check, wire, ACH or direct debit from the applicable TenFour or AlliantWare TD Bank checking account. The Debtors' sales, use, and telecommunication taxes, payments for health insurance premiums, certain capital leases, obligations to its landlord, and the Debtors' software-as-a-service vendors are paid monthly by wire or ACH from the TenFour TD Bank checking/operating account. Payroll is funded directly to the Debtors' human resources service provider, ADP, from the TenFour TD Bank checking account. Payments from the AlliantWare checking/operating account are primarily to vendors for inventory purchases.

51.    In the ordinary course, the Debtors maintain business relationships with each other, which result in intercompany receivables and payables (the "Intercompany Claims").[8] The primary intercompany transactions (the "Intercompany Transactions") giving rise to Intercompany Claims among the Debtors are cash receipts, disbursement activities, expense allocations.[9]

---

[8] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors' enterprise, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, does not require Court approval. Nevertheless, out of an abundance of caution, the Debtors are seeking express authority to engage in Intercompany Transactions on a postpetition basis. The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their businesses as debtors in possession.

[9] In the ordinary course of business, the Debtors incur centrally billed expenses, including with respect to allocation of overhead for employees of TenFour who perform services for other Debtors, payroll and benefits costs and general corporate services. In many cases, TenFour pays these expenses, thereby creating Intercompany Claims that are reflected on the relevant Debtors' balance sheets.

17

52.    Intercompany Claims are not settled by actual transfers of cash among the Debtors. The Debtors track all Intercompany Transactions electronically in their accounting system and concurrently record such transactions on the applicable Debtors' balance sheets, which are regularly reconciled.

53.    Collections are recorded in a central accounting system.   All Intercompany Transactions – including transfers between the Debtors' Bank Accounts – are processed through the existing Cash Management System and made by the Senior Staff Accountant.  During these Chapter 11 Cases, the Debtors will keep records of any postpetition Intercompany Transactions.

54.    The Debtors use various business forms, such as checks, invoices, and letterhead, in the ordinary course of business (the "Business Forms").  Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession. Nonetheless, I believe most parties doing business with the Debtors will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding the Chapter 11 Cases and the notice of commencement served on parties-in-interest.

55.    The Debtors' Cash Management System constitutes an ordinary course and essential business practice that provides the Debtors with the ability to control and monitor funds, collect payments from customers, make disbursements for costs related to the operation of the Debtors' business (e.g., employee obligations, tax obligations, rent, and payments to vendors), ensure the maximum availability of funds when and where necessary, and reduce administrative expense through access to accurate account balance information and other financial data.

56.    The Debtors further submit that the cost and expense of changing the Bank Accounts and implementing a new Cash Management System would not only force the Debtors to incur significant costs and expenses, but would impair the operation of the Debtors' businesses,

ACTIVE.134569051.15

cause confusion, introduce inefficiency at a time when efficiency is most critical, and place a strain on the Debtors' relationships with its customers and vendors.  Relatedly, because of the Debtors' corporate and financial structure, it would be difficult and costly to establish and maintain a separate cash management system for each Debtor, and such steps would cause disruption in the Debtors' operations ultimately resulting in a severe and adverse impact upon the Debtors' bankruptcy estates.

57.     Additionally, in the ordinary course of operating their businesses, it may be necessary for the Debtors to make changes to its Cash Management System, including, but not limited to, opening new bank accounts or closing existing accounts.  The Debtors intend to continue to maintain strict accounting records, including with respect to receipts and disbursements, and any changes to the Cash Management System or Bank Accounts, so that the United States Trustee and parties-in-interest may readily monitor the Debtors' financial activities.

58.     The deposits at issue are secure because of the strength of the Debtors' banking institutions and the available FDIC insurance.  Requiring the Debtors to open multiple accounts at different banks so that the deposits in each such account would be insured by the FDIC would be unnecessarily burdensome and would prevent the Debtors' employees from focusing their attention on the Debtors' efforts to reorganize.

59.     As described in detail in the Cash Management Motion, the Debtors' Cash Management System is complex, and strict enforcement of the U.S. Trustee Guidelines would cause substantial disruption to the Debtors' business activities and would impair their ability to operate during the pendency of these Chapter 11 Cases, including by disturbing the collection of accounts receivable and the timely fulfillment of critical obligations, such as employee payroll and payments to governmental authorities.

19

60.     The Debtors' ability to maintain and use the existing Bank Accounts will facilitate the Debtors' operations in the Chapter 11 Cases.  To avoid delays in receipt of payments and payment of debts incurred postpetition, the Debtors should be permitted to continue to maintain their existing Bank Accounts and, if necessary, to open new debtor-in-possession account(s).

61.     The Debtors believe that continuing the Intercompany Transactions is a sound and appropriate exercise of their business judgment because, among the other reasons discussed in the Cash Management Motion, the Intercompany Transactions facilitate the collection of the Debtors' receivables and satisfaction of the Debtors' obligations, and are otherwise integral to the Debtors' daily operations.  If the Intercompany Transactions were to be discontinued, the Debtors' business operations would be unnecessarily affected.   Thus, the Debtors respectfully submit that continuation of the Intercompany Transactions is in the best interests of the Debtors and their estates.

62.     Requiring the Debtors to print new Business Forms would be burdensome, expensive and disruptive to the Debtors' operations. Because parties doing business with the Debtors will undoubtedly be aware of the Debtors' status as debtor-in-possession, changing Business Forms is unnecessary and unduly burdensome.  Accordingly, the Debtors request that they be authorized to use their existing Business Forms without being required to label each with the "Debtor-in-Possession" designation.  If, however, the Debtors exhaust their supply of Business Forms, they will replace such forms and print "debtor-in-possession" on such forms.

63.     In light of the foregoing, and for the reasons set forth in the Cash Management Motion, I respectfully submit that the Cash Management Motion should be granted. Absent the relief requested in the Cash Management Motion, the Debtors and their estates would suffer immediate and irreparable harm.

ACTIVE.134569051.15

**E.** **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541 for Entry of an Order Authorizing, But Not Directing, the Debtors to Pay Certain Taxes (the "Tax Motion")**

64.    In the Tax Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to remit and pay the Taxes, in the ordinary course of business.

65.    In the normal course of business, the Debtors are required to collect sales taxes (the "Sales Taxes") from purchasers of their products and services on a per sale basis and periodically remit the Sales Taxes to the applicable Governmental Authorities. Typically, Sales Taxes accrue as products and services are sold, and such taxes are calculated based on a statutory percentage of the sale price.

66.    Debtor TenFour collects its Sales Taxes as they accrue and remits the total outstanding Sales Taxes to CliftonLarsonAllen LLP ("CLA"), its paying agent, on or about the 8th day of each month following the month for which the Sales Taxes were collected. CLA then pays the applicable Governmental Authorities on or between the 10th and 20th day of each month following the month for which the Sales Taxes were collected. TenFour also process the Sales Taxes of Debtor AlliantWare, and to the extent applicable, the Sales Taxes of Debtors Technology Keiretsu and Red Forge. Sales Taxes owed by AlliantWare, Technology Keiretsu, and Red Forge are paid directly by the respective Debtor to the applicable Governmental Authorities on or about the 20th day of each month following the month for which the Sales Taxes were collected. CLA does not provide tax services to AlliantWare, Technology Keiretsu, or Red Forge.

67.    The Debtors also incur use taxes (the "Use Taxes") in the ordinary course of business. The Debtors' liability for Use Taxes arises from (i) purchases of fixed assets without sales tax or (ii) purchases of supplies without Sales Tax. Purchases without Sales Tax occur when property or services are purchased from vendors that have no nexus to the resident state of the

ACTIVE.134569051.15

purchaser, such vendors are not obligated to charge or remit Sales Taxes for sales to parties outside the state of the vendor's operations.  Nevertheless, purchasers, such as the Debtors, are obligated to self-assess and pay Use Taxes, when applicable, to the state in which the Debtors are the "end user" of the goods or services provided by the vendor with no nexus to that state.  The tax rate for Use Taxes is equal to the tax rate for Sales Taxes.

68.    As of the Petition Date, the Debtors estimate that approximately $100,000 in Sales Taxes and Use Taxes relating to the prepetition period will become due and owing to the Governmental Authorities in the ordinary course of business.

69.    In the normal course of business, Debtor TenFour is required to periodically remit federal, state, and local telecommunication taxes, fees and surcharges ("Telecommunication Taxes") to the applicable Governmental Authorities.  Typically, Telecommunication Taxes accrue as services are billed, and are calculated based on a statutory percentage of the sale price.

70.    In the case of federal Telecommunication Taxes, TenFour remits the total outstanding amount due to CLA on or about the 8th day of each month following the month for which telecommunication services were billed.  CLA then pays the applicable Governmental Authorities on or between the 10th and 20th day of each month following the month for which telecommunication services were billed.

71.    TenFour does not employ CLA's services to pay its state and local Telecommunication Taxes.  Rather, its state and local Telecommunication Taxes are paid directly by TenFour on or between the 10th and 15th day of each month following the month for which telecommunication services were billed.

22

72.     As of the Petition Date, the Debtors estimate that approximately $175,000 in Telecommunication Taxes relating to the prepetition period will become due and owing to the Governmental Authorities in the ordinary course of business.

73.     For the reasons set forth herein and in the Tax Motion, I respectfully submit that the relief requested in the Tax Motion is in the best interest of the Debtors' estates and creditors. Absent the relief requested in the Tax Motion, the Debtors and their estates could suffer immediate and irreparable harm.

**F.      Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363, and 507(a) for Interim and Final Authority to (I) Pay Certain Pre-Petition Wages and Reimbursable Employee Expenses, (II) Pay and Honor Employee Medical and Other Benefits, and (III) Continue Employee Benefits Programs, and for Related Relief (the "Wages Motion")**

74.     In the Wages Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, them to (i) pay certain prepetition wages and reimbursable employee expenses, (ii) pay and honor employee medical and other benefits, and (iii) continue employee benefit programs and other related relief.

**I.      The Debtors' Workforce**

75.     As of the Petition Date, the Debtors employ approximately 74 full-time employees, including 71 full-time salaried employees (the "Salaried Employees") and 4 hourly employees (the "Hourly Employees") and 5 furloughed (the "Furloughed Employees" collectively with the Salaried Employees and Hourly Employees, the "Employees").[10]  The Employees are primarily highly skilled and college-educated engineers with expertise in information technology, including

---

[10] Although all Employees are employed by TenFour and all perform services for TenFour, certain employees also perform services for Red Forge, and the Debtors allocate overhead related to these expenses as described more fully in the Cash Management Motion.

ACTIVE.134569051.15

designing, implementing, maintaining, monitoring, and repairing network communications systems and security. Among the Employees are a number of foreign nationals, primarily in IT and engineering positions, who have employer-sponsored (H-1B) work visas.[11]

76.    In addition to the Employees, the Debtors also retain the services of approximately three (3) independent contractors (the "Contract Service Personnel"). The Contract Service Personnel work in various positions for the Debtors including, but not limited to, managerial, professional and information technology positions. The Debtors generally pay Contract Service Personnel directly on a weekly basis. The Debtors estimate that, as of the Petition Date, no amounts are outstanding to Contract Service Personnel (the "Unpaid Contract Personnel Compensation"). To the best of the Debtors' knowledge, none of the Contract Service Personnel are individually owed more than the Statutory Cap (defined below) prior to the Petition Date.

## II.    Employee Compensation and Benefits Programs

77.    The Debtors maintain certain compensation and benefits programs and pay various administrative fees and insurance premiums in connection therewith (collectively, the "Compensation and Benefits Programs"). Subject to Court approval and the terms and conditions set forth herein, the Debtors intend to continue to administer the Compensation and Benefits Programs in the ordinary course of business. The Debtors may elect, in their discretion, to exercise their business judgment and modify, change, or discontinue any such programs.

---

[11] In an asset purchase like the one described in the First-Day Declaration, applicable immigration and Department of Labor rules enable the buyer to continue the employment of this segment of the transitioning workforce without interruption and without the need to seek advance permission from immigration authorities.

ACTIVE.134569051.15

A.      **Employee Compensation Obligations**

(i) **Unpaid Compensation**

78.      In the ordinary course of business, the Debtors pay the Salaried Employees on a semi-monthly basis and the Hourly Employees on a 2-week/2-week/3-week basis.  The Debtors' payroll obligations generally include wages, salaries, other compensation (including overtime pay), and payments on account of certain allowances (including travel reimbursement and mobile phone and data charges).  On average, the Debtors' net payroll (after withholdings and deductions) is approximately $660,000 per month.  The last payroll for Salaried Employees prior to the Petition Date was paid on December 14, 2021, for compensation for the pay period ending on December 15, 2021.  The Hourly Employees were paid through and including December 12, 2021.  The majority of the Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employees' accounts.

79.      As of the Petition Date, the Debtors estimate they owe approximately $110,000 to the Employees on account of prepetition payroll obligations, including accrued but unpaid wages and salaries (the "Unpaid Compensation"), all of which will become due during the period between the Petition Date and the Court's consideration and entry of a final order with respect to this Motion (the "Interim Period").  According to the Debtors' records, all Employees that are owed Unpaid Compensation are owed an amount that is less than the $13,650 priority cap imposed by section 507(a)(4) of the Bankruptcy Code (the "Statutory Cap").

80.      Certain Employees earn sale-based commissions and incentives and are typically paid monthly, one month in arrears.  Based on this historical information, the Debtors estimate that they owe approximately $5,000 with respect to sales-based commissions and incentives as of the Petition Date (the "Unpaid Commissions").

25

### (ii) Payroll Maintenance and Workforce Management Fees

81.     The Debtors utilize Automatic Data Processing, Inc. ("ADP") as their third-party payroll administrator for payroll, human capital management, time reporting, and talent and workforce management services.  Generally one (1) business day before each payroll date, ADP generally directly debits funds from the Debtors' TD Bank checking account (account number ending in 8100) and then electronically transfers the funds via direct deposit to the Employees' personal bank accounts.  ADP's services are essential to ensure the continuity of Debtors' payroll system.  ADP is responsible for ensuring that the Employees are paid on time, that deductions are appropriately determined, that payroll reporting is accurate, and that all relevant and applicable standards are adhered.  The Debtors pay ADP approximately $3,000 per month for these services ("Payroll Maintenance Fees").  As of the Petition Date, the Debtors estimate that they owe ADP approximately $3,000 in Payroll Maintenance Fees.

### (iii) Deductions, Governmental Withholdings, and Payroll Taxes

82.     For each applicable pay period, the Debtors make a gross payroll payment to ADP on behalf of each Employee, and then ADP routinely deducts certain amounts from the Employees' gross compensation, including, without limitation and as applicable, deductions on account of the Compensation and Benefits Programs discussed in detail below (collectively, the "Deductions"). On average, the Debtors deduct approximately $60,000 per month in Deductions from the Employees' paychecks for voluntary deductions.

83.     In addition to the Deductions, federal and state laws require the Debtors to withhold amounts related to federal, state, and local income taxes and Social Security, Medicare, and imputed taxes for remittance to the appropriate federal, state or local taxing authorities (collectively, the "Withholdings").  The Debtors must match from their own funds for Social

Security and Medicare taxes and pay, based on a percentage of gross payroll (and subject to state-imposed limited), additional amounts for federal and state unemployment and disability insurance (the "Employer Payroll Taxes" and together with the Withholdings, the "Payroll Taxes").  ADP deducts the Employee portion of the Payroll Taxes from the gross payroll amounts ADP transfers from the Debtors' accounts.  The Debtors separately remit the employer portion of the Payroll Taxes.  ADP directly debits the total amount of Payroll Taxes due from the applicable accounts of the Debtors up to two (2) business day before each payroll date and then remits the Payroll Taxes to the appropriate taxing authorities on behalf of the Debtors on the dates such Payroll Taxes are due.  In the aggregate, the Payroll Taxes total approximately $200,000 per month currently; however, the Payroll Taxes increase in January by up to $50,000 per month.  Except for amounts that may be determined, upon audit, to be due and owing during the Interim Period, as of the Petition Date, the Debtors request authority to pay up to $50,000 in Payroll Taxes due and owing for compensation paid and payable prepetition.

84.    To the extent any of the Payroll Taxes may not have been forwarded to the appropriate third-party recipients, the Debtors seek authority to forward prepetition Payroll Taxes, (and to continue to forward Payroll Taxes on a post-petition basis whether or not related to the pre-petition period), to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

85.    In addition, the Debtors qualified for and received an employee retention credit pursuant to the Coronavirus Aid, Relief and Economic Security (CARES) Act enacted in April 2020 and extended under the American Rescue Plan Act of 2021 (the "Employee Retention

Credits").[12]  As a result of the Infrastrucure Investment and Jobs Act of 2021, that eliminated the

Employee Retention credit for periods beginning October 1, 2021, the Debtors are required to

refund a portion of the Employee Retention Credits in the approximate amount of $380,000 in the

last pay period of December 2021.

### (iv) Reimbursable Expenses

86.    Prior to the Petition Date, in the ordinary course of the Debtors' business, the

Debtors reimburse certain Employees for various expenses incurred in the scope of their

employment, including expenses for travel, cell phone reimbursement, home internet

reimbursement, and professional dues and subscription (collectively, the "Reimbursable

Expenses").  The Reimbursable Expenses were incurred with the Employee's understanding that

the Employee will be reimbursed by the Debtors in accordance with the Debtors' reimbursement

policies, which are issued by the Debtors' accounting department.  In all cases, in order to be

reimbursed for the Reimbursable Expenses, the Employee must apply for reimbursement by

submitting a request form, which the Debtors review and approve for payment upon determination

that the charges are for legitimate, reimbursable business expenses.  Although the Debtors ask that

reimbursement requests be submitted promptly, submission delays occur, and Employees may

submit reimbursement requests for prepetition expenses after the Petition Date.

87.    In the aggregate, the Debtors reimbursed, on average, approximately $10,000 to

$20,000 per month in 2021 for Reimbursable Expenses.  The Debtors estimate that, as of the

Petition Date, they will owe approximately $20,000 in accrued, but unpaid, Reimbursable

Expenses.   The Debtors request authority to pay up to $15,000 owed on account of the

---

[12] For 2021, the Employee Retention Credits are refundable tax credits against certain employment taxes up to 70% of the first $10,000 per quarter of qualified wages paid after December 31, 2020 and prior to October 1, 2021.

ACTIVE.134569051.15

Reimbursable Expenses during the Interim Period and up to an additional $10,000 on a final basis

and to continue honoring such obligations post-petition in the ordinary course and consistent with

their prepetition practices.

**B.      Employee Benefit Programs and Related Obligations**

88.     In the ordinary course of business, the Debtors provide eligible Employees with a

number of employee benefits, including without limitation, medical, dental, and vision insurance,

life insurance, accidental death and dismemberment insurance, long- and short- term disability

insurance, workers' compensation insurance, a 401(k) retirement savings plan, severance pay in

the event of termination, and certain other miscellaneous employee benefits (collectively, the

"Employee Benefit Programs").   The Employees who work 30 or more hours per week are

considered a "full-time employee" by the Debtors and are eligible to enroll in the Employee

Benefit Programs.

89.     On average, the Debtors pay approximately $850,000 each year in respect to the

Employee Benefit Programs and related obligations. [13]   As of the Petition Date, the Debtors

estimate that they are current with respect to payments related to the Employee Benefit Programs.

90.     The Debtors seek authority, in the exercise of their discretion, to pay prepetition

claims (if applicable), to honor obligations, and to continue programs, in the ordinary course of

business and consistent with past practice, relating to the Employee Benefit Programs, subject to

the Debtors' ability to modify or discontinue any employee Benefit Program in their discretion to

reduce applicable costs or the benefits provided thereunder.

---

[13] In January 2022, it is expected that premiums on the Employee Benefit Programs will increase by approximately
five percent (5%).

ACTIVE.134569051.15

**(i) Health Benefits and Health Reimbursement Account**

91.    The Debtors offer medical insurance, dental insurance, and vision insurance (collectively, the "Health Benefits") to eligible Employees.  Specifically, the Debtors offer an exclusive provider organization (EPO) plan and a preferred provider organization (PPO) plan, both through UnitedHealthcare; high and low option dental insurance plans through MetLife Insurance Company; and a vision insurance plan through Principal Financial Services, Inc.

92.    Employees contribute to Health Benefits through payroll deductions; the Debtors pay an additional sum in the total approximate amount of $65,000 per month.[14]  There are no administrative fees associated with maintenance of the Health Benefits.

93.    The Debtors also offer a Health Reimbursement Account ("HRA") for employees participating in the EPO plan, to assist Employees with the cost of in-network, out-of-pocket expenses for the base plan after the applicable deductible is met.  The HRA is administered by Gente, LLC.  There is no funding requirement for the HRA, however, the Debtors pay the cost of the Employee's expenses plus an administrative fees equal to $10 per reimbursement check issued to an Employee.  As of the Petition Date, the Debtors estimate that they owe approximately $50 on account of reimbursement requests from the HRA.

**(ii) Retirement Savings**

94.    For eligible Employees, the Debtors maintain a defined contribution plan meeting the requirements of sections 401(a) and 401(k) of the Internal Revenue Code (the "401(k) Plan"), which is managed by third party administrator, FuturePlan.  The Debtors match fifty percent (50%)

---

[14]This approximate monthly cost of $65,000 includes the cost of Health Benefits, together with HRA and Life and AD&D Insurance, as each is defined herein.

ACTIVE.134569051.15

of the Employee's contribution, up to three percent (3%) of the Employee's base salary for that pay period (the "Matching Contribution").

95. On an annual basis, the Debtors pay approximately $75,000 in Matching Contributions to the 401(k) Plan. Payments to FuturePlan for administering the 401(k) Plan are drawn directly from 401(k) funds, but to the extent that assessed fees are insufficient to cover administrative expenses incurred, the Debtors may be liable for such expenses. Historically, the Debtors pay FuturePlan approximately $5,000 per year in administrative fees related to the 401(k) Plan.

96. As of the Petition Date, the Debtors believe that they are current on contributions to and administrative fees related to maintenance of the 401(k) Plan. The Debtors request the authority, but not direction, to maintain the 401(k) Plan, and pay any pre-petition amounts owed, in the ordinary course during the administration of these Chapter 11 Cases.

**(iii) Additional Employee Benefit Programs**

**a. Disability Insurance**

97. The Debtors offer eligible Employees with short term disability insurance ("Short Term Disability Insurance") and long term disability insurance ("Long Term Disability Insurance" and together with Short Term Disability Insurance, "Disability Insurance").

98. Short Term Disability Insurance is offered at no cost to the eligible Employee through Unum. Eligible Employees working in New Jersey are automatically entitled to Short Term Disability Insurance, however, the Debtors supplement this state coverage with additional private coverage. The Short Term Disability Insurance benefits continue a portion of the Employee's base salary (equaling sixty percent (60%) of the Employee's income up to $1,500 per week) in the event of a short-term medical disability, illness or injury, payable on a weekly basis.

ACTIVE.134569051.15

On average, the Debtors pay a total of approximately $3,000 per month for short-term disability benefits.  The Debtors do not incur administrative fees or other costs in connection with maintenance of Short Term Disability Insurance.  As of the Petition Date, the Debtors estimate that there is no outstanding balance with respect to the Short Term Disability Insurance.

99.    The Debtors also offer Long Term Disability Insurance to eligible Employees through Unum.  Long Term Disability Insurance is paid in full by the Employee through voluntary payroll deductions.  The Long Term Disability Insurance benefits can continue a portion of the Employee's base salary (equaling sixty percent (60%) of the Employee's base salary with a maximum benefit of $20,000 for Class 1 Participants (executives) and $7,500 for Class 2 participants (all other eligible employees)) if the Employee is unable to work due to illness or a non-work related injury for more than ninety (90) consecutive days, payable on a monthly basis. Employees pay approximately $2,100 per month for long-term disability benefits.  Unum is paid through ADP as discussed above.  The Debtors do not incur administrative fees or other costs in connection with maintenance of these policies.

**b.  Life Insurance**

100.    The Debtors offer eligible Employees with one time their annual base salary to a maximum of $200,000 in group life and accidental death and dismemberment insurance ("Life and AD&D Insurance") provided by Unum.  The Life and AD&D Insurance is offered at no cost to the eligible Employees.  On average, the Debtors pay a total of approximately $1,000 per month for Life and AD&D Insurance.  The Debtors do not incur administrative fees or other costs in connection with maintenance of these policies.

32

### c. COBRA

101.    The Debtors request the authority to continue to perform their obligations, if any, under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("COBRA") in respect of former Employees and their covered dependents. The Debtors' COBRA obligations are administered by BeneDirect by WageWorks, Inc ("WageWorks").  Any costs and fees associated with the COBRA program are collected from the Employees that utilize the COBRA benefit.  The Debtors pay $100 per month for COBRA administration fees.

### d. Flexible Spending Accounts

102.    The Debtors offer eligible Employees the option to contribute a portion of their pre-tax compensation to a healthcare flexible spending account ("FSA"), which is administered by WageWorks.  The FSA can be used to cover for various health and dependent care expenses. Employee contributions to their FSAs are withheld from the Employees' paychecks by ADP and transferred to WageWorks to be deposited into the Employees' accounts.  The Debtors pay WageWorks a total of approximately $150 per month to administer the FSA accounts.  The Debtors estimate that, as of the Petition Date, they owe approximately $150 in respect of administrative fees associated with the FSAs and have withheld approximately $15,000 from the Employees' paychecks that have not been disbursed for reimbursement of claims.  The Debtors seek authorization, but not direction, to continue to pay prepetition and post-petition costs of the FSAs and to continue to remit funds for reimbursement of claims during the pendency of the Chapter 11 Cases.

ACTIVE.134569051.15

### (iv) Severance Benefits

103.    Although the Debtors do not maintain a formal, written policy, as part of their pattern and practice, the Debtors offer to eligible Employees severance pay of one week for each year of service, with a minimum of two weeks and capped at twenty-six weeks, including both insider and non-insider participants (the "Severance Plan").[15]

104.    The Debtors' ability to pay and provide severance is critical to maintaining Employee morale and loyalty, particularly during these Chapter 11 Cases.  Providing Employees with reasonable severance packages will ensure that all Employees, including those whose efforts may be necessary to the effective implementation of the Debtors' restructuring initiatives at a time when they are personally facing the loss of their own employment, will continue to work towards achieving the goals of the Chapter 11 Cases.

105.    The Debtors do not seek authority to make payments under the Severance Plan to any "insiders" as that term is defined by section 101(31) of the Bankruptcy Code.  The Debtors are not currently making payments to non-insider former Employees on account of the Severance Plan.  However, in an abundance of caution, to the extent necessary during these Chapter 11 Cases, the Debtors seek authority, but not direction, to pay any obligations that have accrued prepetition but remain unpaid on account of the Severance Plan with respect to non-insider Employees.  The Debtors seek authority to pay each applicable Employee in an aggregate amount not to exceed the Statutory Cap, inclusive of amounts paid under the Proposed Orders.  In addition, the Debtors seek

---

[15] Finally, the Debtors reserve their rights to modify the Severance Plan postpetition and, in the event that the Debtors determine to modify the Severance Plan in their business judgment, the Debtors will seek appropriate relief from the Court.

ACTIVE.134569051.15

authority to continue to honor the Severance Plan in the ordinary course of business and consistent with their prepetition practices.

### C.    Workers' Compensation Program

106.    Under applicable state law, the Debtors are required to maintain workers' compensation insurance policies and programs to provide the Employees with coverage for claims arising from or related to their employment with the Debtors (the "Workers' Compensation Program"). If the Debtors fail to maintain the Workers' Compensation Program, among other things, state law may prohibit them from operating.

107.    Currently, the Debtors maintain a fully insured workers' compensation policy through The Hartford, identified by policy number 34 WBC AL2YAZ ("The Hartford Policy"). The Hartford Policy expires in on April 30, 2022; it is scheduled to renew on May 1, 2022. The Debtors are not responsible for any deductible on The Hartford Policy. The annual cost of the Workers' Compensation Program is approximately $20,000. The Debtors are current on their obligations under The Hartford Policy and there are no pending or outstanding claims.

108.    In light of state laws requiring the Debtors to maintain appropriate works' compensation coverage, the Debtors seek authority to maintain their prepetition Workers' Compensation Program, including the authority to make any and all payments required in connection therewith.

109.    For the reasons set forth herein and in the Wages Motion, I respectfully submit that the relief requested in the Wages Motion is necessary and critical to the Debtors' ability to preserve value for the benefit of the Debtors' estates, their creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases within

35

minimal disruption, thereby maximizing the value for the estates. Absent the relief sought in the Wages Motion, the Debtors and their estates would suffer immediate and irreparable harm.

**G.     Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) for Interim And final Authority to (I) Maintain, Renew, and Continue Their Insurance Policies and Programs and (II) Honor All Insurance Obligations (the "<u>Insurance Motion</u>")**

110.    In the Insurance Motion, the Debtors seek entry of an order (i) authorizing, but not directing, them to continue to maintain, renew, and continue the Insurance Policies and Programs and honor the Insurance Obligations in the ordinary course of business during the administration of the Chapter 11 Cases; (ii) authorizing, but not directing, the Debtors to pay any prepetition Insurance Obligations, to the extent the Debtors ultimately become aware of any; and (iii) authorizing the Banks to honor and process check and electronic transfer requests related thereto.

111.    In connection with the operation of the Debtors' business, the Debtors maintain various insurance policies and workers' compensation programs (as renewed, amended, modified, endorsed, and/or supplemented from time to time, and including any exhibit or addenda thereto, collectively, the "<u>Insurance Policies and Programs</u>") and all Insurance Premiums (as defined in the Insurance Motion), assessments, broker fees, and other obligations related thereto, including any taxes or other fees (collectively, the "<u>Insurance Obligations</u>"), through several different insurance carriers (each, an "<u>Insurance Carrier</u>," and collectively, the "<u>Insurance Carriers</u>"), including the Insurance Policies and Programs and Insurance Carriers listed on Exhibit C to the Insurance Motion (the "<u>Insurance Schedule</u>").[16]

---

[16] In addition to the Insurance Policies and Programs listed on the Insurance Schedule, the Debtors maintain an insurance policy with respect to the Debtors' workers' compensation program (the "<u>Workers' Compensation Program</u>"). This policy is described in the Wages Motion. The Debtors request authority to, among other things,

36

112.    The Insurance Policies and Programs include various liability, property, and other

insurance policies, which provide the Debtors with insurance coverages related to automobile,

directors' and officers' liability, cybercrime, umbrella liability, general liability, and errors and

omissions liability.[17]  The Debtors maintain the Insurance Policies and Programs to help manage

and limit the risks associated with operating their businesses.  The Insurance Policies and Programs

are essential to the preservation of the value of the Debtors' businesses and property.

113.    Pursuant to the Insurance Policies and Programs, the Debtors pay annual premiums,

which are billed by each Insurance Carrier (collectively, the "Insurance Premiums").  The Debtors'

total annual Insurance Premiums is approximately $175,000, which are paid in installments.  The

Debtors do not believe any pre-petition amounts are currently due and owing on account of

Insurance Premiums, nevertheless, out of abundance of caution, the Debtors seek authority to pay

such pre-petition Insurance Premiums when they become due and owing during the Chapter 11

Cases.  The Debtors anticipate that up to approximately $18,000 in Insurance Premiums will

become due and payable within the first 21 days of the Chapter 11 Cases.

114.    The Debtors utilize IMA Financial Group, Inc. (the "Insurance Broker") to assist

with the procurement and negotiation of certain Insurance Policies and Programs.  For errors and

omissions liability insurance, the Debtors make payments to the Insurance Broker.  Further, for

---

maintain their Workers' Compensation Program in the Wages Motion.  As such, the Debtors' applicable disability
benefits policy is not listed on the Insurance Schedule and is described in the Wages Motion.

[17] It is possible that certain of the Insurance Policies and Programs may have been inadvertently omitted from the
Insurance Schedule.  Accordingly, the Insurance Schedule represents a non-exhaustive list of the Debtors' Insurance
Policies and Programs.  To the extent the Debtors subsequently become aware of additional Insurance Policies or
Programs that have not previously been disclosed, the Debtors will disclose these additional Insurance Policies and
Programs to the U.S. Trustee.  In addition, the descriptions of the Insurance Policies and Programs provided in the
Insurance Motion are intended only as a summary, and the actual terms of the foregoing shall govern in the event of
any inconsistency with the descriptions set forth therein.

37

the directors' and officers' liability insurance, the Debtors make payments to Imperial PFS Corporation.  For the remaining Insurance Policies and Programs, the Debtors make payments directly to the Insurance Carriers.

115.    The Insurance Obligations, including Insurance Premiums, which will become due and owing during the pendency of the Chapter 11 Cases are listed in the Insurance Schedule.  The Debtors seek authority, but not direction, to pay such Insurance Obligations that are or may become due and owing during the Chapter 11 Cases, including renewal of existing Insurance Policies and Programs.

116.    Maintaining the Debtors' insurance coverage under the Insurance Policies and Programs is a crucial ordinary-course-of-business transaction.  If any of the Debtors' Insurance Policies and Programs are terminated or lapse, the Debtors would be exposed to substantial liability.  Protection of these important estate assets—and the authority to pay, in the Debtors' discretion, all Insurance Obligations including any unpaid prepetition Insurance Obligations—is essential to continuation of the Debtors' businesses and preservation of value of the estate for all parties in interest.

117.    The Debtors have sufficient funds to pay any prepetition amounts that the Debtors become aware of in the ordinary course by virtue of expected cash flows from ongoing operations, access to unencumbered cash, and anticipated access to cash collateral.  Accordingly, there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made.

ACTIVE.134569051.15

H.    **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for Entry of Interim and Final Orders Pursuant to Bankruptcy Code § 366 Regarding Adequate Assurance of the Future Performance for Utilities and Establishing Procedures for Determining Requests for Additional Adequate Assurance ("Utility Motion")**

118.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (i) prohibiting the Utility Providers from altering, refusing, or discontinuing Utility Services on account of prepetition invoices; (ii) determining that the Debtors have provided each Utility Provider with adequate assurance of payment based on the Debtors' establishment of the Utility Deposit Account holding the Utility Deposit; and (iii) establishing the Assurance Procedures.

119.    In the ordinary course of their businesses, the Debtors receive services from utility providers (each, the "Utility Provider," and collectively, the "Utility Providers").  The Utility Providers provide telecommunications, internet connectivity, and other services (collectively, the "Utility Services").  A list of the Utility Providers as of the Petition Date is attached to the Utility Motion as Exhibit C.

120.    On average, the Debtors spend approximately $7,000 each month on utility costs (the "Utility Obligations").  The Debtors are seeking to continue payments of the Utility Obligations in ordinary course, including amounts outstanding as of the Petition Date.

121.    The Debtors could not operate their businesses or serve their customers in the absence of continuous Utility Services.  Any termination or cessation, even if only temporary, of any of the Utility Services will result in disruption to the Debtors' business, which, in turn, will likely diminish or impair the Debtors' efforts to preserve and maximize the value of their estates.  Accordingly, it is critical that the Utility Services continue uninterrupted.

122.    The Debtors intend to pay post-petition Utility Obligations in a timely manner.  The Debtors anticipate that their cash on hand, together with cash flows from operations and their

ACTIVE.134569051.15

proposed use of cash collateral, will provide sufficient liquidity to pay all the Utility Obligations

in the ordinary course of business, consistent with their prepetition practice.

123.    Through the Utility Motion, the Debtors seek orders approving their proposed

Assurance Procedures as adequate within the meaning of section 366 of the Bankruptcy Code and

granting them authority to implement, and require Utility Providers to comply with, the proposed

Assurance Procedures in connection therewith. The Assurance Procedures will allow Utility

Providers to request additional adequate assurance for unpaid utility services if they believe the

proposed amount is insufficient.

124.    Accordingly, for the reasons set forth herein and in the Utilities Motion, I

respectfully submit that the relief requested in the Utilities Motion is necessary and in the best

interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the

Debtors to continue to operate their business and to safeguard the value of their estates.

I.    **Debtors' Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) for Entry of an Order Appointing Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtors**

125.    The Debtors seek entry of an Order appointing Donlin, Recano & Company, Inc.

("DRC") as claims and noticing agent (the "Claims and Noticing Agent") in these Chapter 11

Cases. DRC will assume full responsibility for the distribution of notices and the maintenance,

processing, and docketing of proofs of claims filed in the Chapter 11 Cases.

126.    DRC is a bankruptcy administrator specializing in claims management and legal

administration services.  DRC provides comprehensive chapter 11 services, including noticing,

claims processing, balloting, and other related services critical to the effective administration of

chapter 11 cases.

40

127.    Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be approximately 750 entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.

128.    DRC has significant experience in both the legal and administrative aspects of large, complex chapter 11 cases and its professionals have experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity. I believe that the Claims and Noticing Agent's appointment is the most effective and efficient manner of noticing creditors and parties-in-interest of the filing of and developments in these Chapter 11 Cases. In addition, the Claims and Noticing Agent will transmit, receive, docket and maintain proofs of claim filed in connection with these Chapter 11 Cases. Accordingly, I believe that the appointment of the Claims and Noticing Agent to act as an agent of this Court is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and respectfully submit that the Court should grant the Debtors' motion to appoint the Claims and Noticing Agent.[18]

129.    For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First-Day Motions filed concurrently herewith.

*[Remainder of page intentionally left blank]*

---

[18] The Debtors likely will file a subsequent application to retain Donlin, Recano & Company, Inc. to perform certain administrativeservices under section 327 of the Bankruptcy Code.

ACTIVE.134569051.15

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 21, 2021

Mark P. Cantaluppi

Chief Executive Officer

ACTIVE.134569051.12